## THE FROGNER.

## GULLICKSEN v. CHICORA FERTILIZER Co. *et al.*

*(District Court. D. South Carolina. February 23, 1892.)*

**FREIGHT—CARGO "INTAKEN"—AMOUNT—INTENT OF PARTIES.**
Where a charter-party provides for a certain rate of freight on "about 1,500 tons" of iron ore "intaken,"—the original word "delivered," in the charter-party, being stricken out, and the word "intaken" written in,—and the master, at the port of loading, being without opportunity of weighing, demanded 1,575 tons, which amount was promised him, and a bill of lading made out therefor, and assurance given the master that he had that amount, and the ship, after a safe voyage without incident, delivered only 1,500 tons, no question of short delivery being raised, but only the question whether freight should be paid on 1,575 tons or on the amount delivered, *held*, that the parties had agreed at the port of loading as to the number of tons on which freight should be paid, viz., 1,575 tons.

In Admiralty. Libel to recover balance of freight.

*Bryan & Bryan*, for libelant.
*J. N. Nathans*, for respondents.

SIMONTON, District Judge. Respondents are the purchaser from H. G. Mayer & Co. of a cargo of pyrites, and the agent of Mayer & Co., who also is guarantor of the freight. Mayer & Co. entered into a charter-party with the owners of the steam-ship Frogner, under which she took in at Pomaron, on the coast of Portugal, the cargo of sulphur ore, or pyrites, sold to the Chicora Company. The charter-party provided for a cargo of a' out 1,500 tons of pyrites, not exceeding what she can reasonably stow and carry, to be discharged on Ashley river, Charleston, S. C., on being paid freight at the rate "per ton of 20 cwt. intaken 16 (sixteen) shillings." The original charter-party had the word "delivered" in print. It was stricken out, and the word "intaken" written in its stead. The freight is payable on unloading and right delivery of cargo. The master could sign bills of lading, if required, at any rate of freight, but without prejudice to charter-party. The steam-ship loaded partly in port, and finished loading at sea. The ore was weighed only at the mines, some 40 miles away, was carried by rail, and dumped into the ship, a part from the quay and a part from lighters. The master demanded a cargo of 1,575 tons. This was promised to him. Before cargo was all delivered, a bill of lading for 1,575 tons was prepared by charterer, and presented to the master for his signature, and he signed it. Afterwards the agent of the charterer at Villareal stated to the master that he had shipped 1,575 tons. After a safe voyage without incident the steam-ship reached this port, and delivered cargo. Its delivery weight was 1,500 938-2240 tons. No question of short delivery is made. The only controversy is, shall freight be paid on 1,575 tons, or on the number of tons delivered? Is the freight to be paid upon the number of tons attributed to her at the port of lading, or are we bound to conclude that, as only 1,500 938-2240 tons have been delivered, and there is no question of short delivery, this was the amount "intaken," and not 1,575 tons? If the number of tons delivered is conclusive evidence of the number of tons intaken, the careful erasure from the charter-party of the printed word "delivered," and the insertion of the written word "intaken," was an idle ceremony. This would assume and give to respondents the full benefit of the assumption that the weight of the cargo is fixed by a definite, certain, inflexible, and unchangeable standard; that there can be no error or fluctuation, loss of quantity, or diminution in weight; and that the exact number of tons which went in at Pomaron would come out here. The evidence discloses the fact that the weight of the intaken cargo and the output at the port of delivery seldom, if ever, agree. The contract of sale produced in this case provides for 20 per cent. of smalls; that is, the fine powder by abrasion of the particles of ore. This shows that lumps of pyrites disintegrate, and that the amount of disintegration may reach 20 per cent. A part of the evidence was a bottle of sample ore sent with cargo, and kept sealed. The bottom of this bottle is filled

with a fine powder,—*debris* of the ore. The adoption of the rule suggested by respondent prevents the vessel from asserting this. The master demanded 1,575 tons. He was assured that he had this number, both at the place of loading and at Villareal de San Antonio, a port of call provided in the charter-party. The bill of lading prepared by the agent of the charterer called for 1,575 tons. It is manifest, therefore, that this is the amount attributed to cargo by both parties at the port of lading. The freight was to be regulated by the number of tons intaken, and to be fixed at the port of lading. In effect, it fixed the amount of freight which the one party agreed to pay, and which the other party expected to receive, as the compliance with and the result of his demand. The manner in which the ship was loaded from a train of cars, partly at the quay and by lighters at sea, precluded the master from weighing it himself. The charterer was the purchaser of this cargo, and expected to sell it again. The ship could reasonably trust that he would not overstate the cargo he was getting from the mines. When he made his demand, the master calculated upon 1,575 tons, at 16 shillings per ton. By their assurances the agents of the charterer prevented him from securing his expectations. In my opinion, both parties agreed to assume that 1,575 tons was the weight of the cargo intaken, and adopted that as the number on which freight should be estimated. See *Spaight* v. *Farnworth*, 5 Q. B. Div. 119. Let a decree be entered in accordance with this opinion.